## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 26 2015, 6:20 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Timothy J. O'Connor
O'Connor & Auersch
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Karl M. Scharnberg
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Antwain Bateman,[1]

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

March 26, 2015

Court of Appeals Case No.
49A02-1407-CR-483

Appeal from the Marion Superior Court

Lower Court Cause No.
49G05-1312-FC-78967

The Honorable Grant W. Hawkins, Judge

**Pyle, Judge**

---

[1] Defense counsel spells the appellant's name as "Batemon" in his brief but "Bateman" on the Appellant's Appendix. Likewise, the appellant's name is spelled inconsistently throughout the record. Because his name is spelled "Bateman" on our online docket, that is how we will spell his name here.

# Statement of the Case

Appellant/Defendant, Antwain Bateman ("Bateman"), appeals his convictions for Class C felony forgery[2] and Class D felony theft[3] for purchasing, along with three other defendants, items at a Target store using counterfeit currency. On appeal, Bateman argues that the State did not produce sufficient evidence to prove that he committed forgery because the State did not prove that he gave, or intended to give, counterfeit money to his co-defendant, who in turn gave the money to the Target cashier. As an extension of the first issue, he also argues that if the State did not prove that he intended to give counterfeit money to Target, the State did not prove that he committed theft. We conclude that Bateman's arguments are requests that we reweigh the evidence, which we will not do. Instead, we find that the State did produce sufficient evidence to support both of his convictions.

We affirm.

# Issue

Whether the State produced sufficient evidence to prove that Bateman committed Class C felony forgery and Class D felony theft.

---

[2] IND. CODE § 35-43-5-2(b)(4). We note that, effective July 1, 2014, a new version of this statute was enacted and Bateman's offense would now qualify as a Level 6 felony. However, because Bateman committed his offense in 2013, we will apply the statute in effect at that time.

[3] I.C. § 35-43-4-2(a). We note that, effective July 1, 2014, a new version of this statute was also enacted, and Bateman's offense would now qualify as a Level 6 felony. Because Bateman committed his offense in 2013, we will apply the statute in effect at that time.

## Facts

[2] The Glendale Target store in Indianapolis receives roughly $2,000 in counterfeit money every month. If the amount of counterfeit money in a single transaction is lower than $50 or $100, Target will generally let the amount pass, but the store will call and file a report with the Indianapolis Metropolitan Police Department ("IMPD") if the amount is over $200. In December of 2013, a lot of the "high dollar items" in the electronics department, especially Beats by Dre headphones, were being stolen, so the store was monitoring the department. (Tr. 28).

[3] On December 11, 2013, Bateman and three other men, D'Andre Driver ("Driver"), Stephen Wilbert ("Wilbert"), and Ryan Mahone ("Mahone"), drove together to the Glendale Target store. Bateman and Driver entered the store together at 7:00 p.m., separately from Wilbert and Mahone. While they were in the store, Target's Senior Assets Protection Specialist David Casiano ("Casiano") was watching the surveillance video feed of the Target electronics department. His attention was drawn to Bateman and Driver when they selected Beats by Dre Headphones off of the "front end cap[s]" of the aisle and then "quickly" selected a television and Xbox 360. (Tr. 29).

[4] After observing this conduct, Casiano went to the sales floor to observe Bateman and Driver in person. He stood about twenty to thirty feet away from them as they reached the cashier to checkout, and he saw Bateman pull a wallet out of his pocket and hand "some, a couple, a few hundred" dollar bills from his wallet to Driver, who combined the money with his own cash. (Tr. 34).

Driver then handed the money to the cashier, who placed it in the farthest right till of the register. Casiano later testified that this till is reserved for bills of the highest denominations.

[5] When Bateman and Driver left the store, Casiano went to the cashier's register and asked to look at the money they had given the cashier. He noticed immediately that "[a]bout half" of the bills were duplicated and had matching serial numbers. (Tr. 34). There were nine counterfeit one hundred dollar bills and a genuine fifty dollar bill underneath the pile of one hundred dollar bills. There were also genuine bills of other denominations in the drawer and one genuine hundred dollar bill. Casiano retrieved the counterfeit cash from the drawer and a printout of Bateman and Driver's receipt, which totaled $932. He did not leave any hundred dollar bills in the drawer. He then contacted law enforcement to file a police report. However, while he was on the phone with the police, he noticed that Bateman and Driver were still standing outside of the Target store, so the IMPD dispatched police officers to the scene.

[6] Two or three minutes after Bateman and Driver left the store, Casiano, who was still standing near the cash registers, noticed Mahone and Wilbert approach the cash register that Bateman and Driver had used with a shopping cart full of similar electronic items.[4] At the register, Wilbert began putting the merchandise on the conveyor belt, and Mahone walked outside. The cashier

[4] He later reviewed a surveillance video and observed that Mahone and Wilbert had entered the Target right after Bateman and Driver and had also spent only ten minutes in the store shopping.

scanned the merchandise, but Wilbert did not pay. Instead, he walked outside and met Mahone, Bateman, and Driver at the vehicle. Mahone handed something to Wilbert, and Wilbert put it in his pocket. Casiano was not close enough to identify what the item was, but Wilbert then walked back inside the store and handed the cashier money from the same pocket where Wilbert had placed the item or items Mahone had given him.

[7] Within thirty seconds of Mahone and Wilbert's exit from the store, Casiano checked the money drawer of the cash register they had used and found four new counterfeit one hundred dollar bills. The bills had identifying marks, including a mark on Benjamin Franklin's face "that no other bill[s] ha[ve]." (Tr. 75). They also had a "chemical smell" that was "a bit unusual." (Tr. 75).

[8] Meanwhile, by the time that Wilbert exited the store, Officer Curt Collins ("Officer Collins") from the IMPD was on the scene. He detained the four men and called the United States Secret Service. Special Agent Darren Brock ("Special Agent Brock") responded to Officer Collins' call and came to Target to interview the four men. At the conclusion of his interviews, Officer Collins arrested the four of them and searched them. He discovered one more counterfeit bill on Bateman, two more counterfeit bills on Wilbert, and one more counterfeit bill on Driver.[5]

---

[5] There is some indication in the record that Officer Collins may have found two, rather than one, counterfeit bills on Bateman.

[9]     Subsequently, on December 16, 2013, the State charged Bateman with Class C felony forgery, Class D felony theft, and Class D felony counterfeiting. The trial court held a bench trial for all four co-defendants on May 29, 2014. At trial, Special Agent Brock testified to common behaviors of counterfeiters. He noted that counterfeiters tend not to spend much time shopping or comparing prices for expensive purchases. In addition, counterfeiters that work in a group check out using the same cash register to minimize the number of cashiers who might potentially identify counterfeit currency. With respect to the instant case, Special Agent Brock explained that the identifying mark on Benjamin Franklin's face on all of the bills was a mark that had begun appearing on counterfeit currency throughout Indiana in the middle of November 2013. He also noted that the seventeen counterfeit bills recovered from the defendants did not have the proper color shifting ink on a portion of the bills and that the "paper texture [was] a bit off." (Tr. 142). Similarly, Casiano testified that the bills had a chemical smell that was "a bit unusual." (Tr. 75).

[10]    Also at trial, Bateman testified that the reason he had handed money to Driver while checking out was that Driver owed him money, so the two of them agreed to split the price of a toy that Bateman had picked out. According to Bateman, he gave Driver three twenty dollar bills to pay for his half of the cost of the toy. He could not remember which toy they had agreed to split but said that it was not Legos. Driver testified that the toy was a "girlie toy" for Bateman's daughter. (Tr. 199).

At the conclusion of the trial, the trial court found Bateman guilty as charged. Thereafter, on June 17, 2014, the trial court merged Bateman's counterfeiting charge with his forgery charge and sentenced him to four (4) years for the forgery conviction and 545 days for the theft conviction. It also ordered that Bateman serve two years in community corrections and suspended the rest of his sentence to probation. Bateman now appeals.

## Decision

On appeal, Bateman argues that the State did not present sufficient evidence to convict him of Class C felony forgery. He asserts that the State did not prove that the money he gave to Driver was counterfeit because Casiano did find some genuine currency in the cash register after he and Driver left. Alternately, he argues that the State did not prove that he knew the currency was counterfeit. We will address each of these arguments in turn.

The standard of review for a sufficiency of the evidence claim is that this Court should only reverse a conviction when reasonable persons would not be able to form inferences as to each material element of the offense. *Perez v. State*, 872 N.E.2d 208, 212-13 (Ind. Ct. App. 2007), *trans. denied.* We do not reweigh evidence or judge the credibility of witnesses. *Id.* at 213. In addition, we consider only the evidence most favorable to the judgment and the reasonable inferences stemming from that evidence. *Id.*

Under INDIANA CODE § 35-43-5-2(b), a person commits forgery if he "with intent to defraud, makes, utters, or possesses a written instrument in such a

manner that it purports to have been made: (1) by another person; (2) at another time; (3) with different provisions; or (4) by authority of one who did not give authority." Here, the State charged that Bateman had "uttered" an instrument purported to have been made by the United States Department of Treasury. (App. 20-21). In order to prove that Bateman uttered the bills, the State was required to show that he "issued, authenticated, transferred, published, delivered, sold, transmitted, presented, or sold" them. I.C. § 35-31.5-2-345. This Court has defined uttering as the "offering of a forged instrument, knowing it to be such, with a representation that it is genuine, and with intent to defraud." *Miller v. State*, 693 N.E.2d 602, 604 (Ind. Ct. App. 1998).

[15] First, Bateman claims that he did not utter a forged instrument because the bills that he gave Driver were genuine. He argues that he gave driver $60, and Driver used counterfeit hundred dollar bills to pay for the remainder of the purchase price of the Target goods. In support of this contention, he notes that the total cost of the purchases was $932, and there were only nine proven counterfeit bills in the drawer. Further, Driver tendered $960 in cash to the cashier.

[16] However, Bateman's argument is an attempt to reweigh the evidence, which we will not do. *See Perez*, 872 N.E.2d at 213. The State produced sufficient evidence that the bills Bateman gave Driver were counterfeit one hundred dollar bills. Casiano testified that, after Bateman gave Driver the bills, he saw the cashier put them in the farthest right till of the cash register, the till reserved

for the highest denominations of money. Although Casiano could not identify exactly how many bills Bateman had given Driver, he testified that it was "some, a couple, a few hundred dollar bills." (Tr. 34). At a minimum, therefore, Casiano observed Bateman give Driver two hundred dollar bills, so Bateman cannot claim that he contributed only the genuine one hundred dollar bill that Casiano found in the till.

[17] Further, there was circumstantial evidence that the bills Bateman gave Driver were counterfeit. When Officer Collins later searched Bateman, he found that Bateman had two counterfeit hundred dollar bills remaining in his possession. In addition, although Bateman claims that he paid Driver sixty dollars to "[go] *half*" on a toy for his daughter, the only toy they bought that cost $120 was a lego set, which Bateman specifically testified was not the toy he meant. (Tr. 188) (emphasis added). The only other item on his receipt that could have potentially been a toy only cost $71.99, so Bateman would not have been splitting the cost of the toy with Driver if he paid sixty dollars.

[18] Next, Bateman argues that the State did not produce sufficient evidence that he knew the money was counterfeit and, therefore, intended to defraud Target. Specifically, he argues that there was no evidence that he ever handled the counterfeit money or handled it to the extent that he could have known it was fake.

[19] Intent to defraud requires a showing that the defendant demonstrated intent to deceive and thereby work reliance and injury. *Wendling v. State*, 465 N.E.2d

169, 170 (Ind. 1984). Actual injury is not required; potential injury is enough. *Bocanegra v. State*, 969 N.E.2d 1026, 1028 (Ind. Ct. App. 2012), *trans. denied.* This intent may be proven by circumstantial evidence, including the defendant's general conduct when presenting an instrument for acceptance. *Wendling*, 465 N.E.2d at 170.

[20] Because we have already determined that Bateman gave Driver counterfeit bills, we also conclude that he handled him. As for whether he handled them to the extent that he could have known they were fake, the trial court made an express finding stating:

> I will say as I sat here about eight feet from [Special] Agent Brock while he looked at that money, I thought to myself it did look pretty good from here. But as soon as you touch it, [] Ms. Hall's argument [] struck me, which is money is money and it does [not] matter how many hundred dollar bills you see, it's clearly a different texture and then all the things, there was no watermark, there was no strip down the side, there was—to me it was pretty clear. . . . So that's just the court's findings as to touching the money itself. I do [not] necessarily buy the argument that you would [not] know. So I do find that the State has met its burden beyond a reasonable doubt.

(Tr. 224). In addition, Casiano and Special Agent Brock testified that the bills had a chemical smell, and their texture was "a bit off." (Tr. 142). Again, Bateman's argument is a request for us to reweigh this evidence, which we will not do. *See Perez*, 872 N.E.2d at 213. Accordingly, we conclude that the State

produced sufficient evidence to prove that Bateman committed Class C felony forgery.[6]

Affirmed.

Barnes, J., and May, J., concur.

---

[6] Bateman also challenges his conviction for Class D felony theft. However, the basis for his argument is that he did not commit forgery and, therefore, did not intend to deprive Target of its property and the value of that property. Because we conclude that there was sufficient evidence to support his forgery conviction, we need not address this second issue.